## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-01174-CBS

**THOMAS PATRICK CLAEYS**

Plaintiff,

v.

**CHRISTIAN MOHR,** *et al.,*

Defendants

_____

## PLAINTIFF'S COMBINED RESPONSE TO CHRISTIAN MOHR'S AND JIM WOOLF'S
## MOTIONS FOR SUMMARY JUDGMENT
_____

THE PLAINTIFF, Thomas Patrick Claeys ("Claeys") by and through his undersigned counsel, provides the following response to Christian Mohr and Jim Woolfe's motion for summary Judgment:

## INTRODUCTION

The Defendants move for summary judgment based upon the grounds of qualified immunity.  The only basis alleged by the Defendants for purposes of summary judgment is that the Affidavits prepared by Woolf and Mohr were truthful and stated probable cause.

It is clear that the statements by Shawn Sheeley included in the Affidavits were false, making the Affidavits themselves false or materially misleading.  Also, as will be discussed further, below, there were other omissions which made the Affidavits materially misleading, vitiating probable cause.

### FACTS AND BACKGROUND

The Plaintiff, Thomas Patrick Claeys ("Tom Claeys"), at all times pertinent hereto was a resident of Elbert County, Colorado.  Specifically, his address was and is 30988 Magic Dog Circle, Kiowa, Colorado 80117.

In the 2008-09 timeframe, Claeys became romantically involved with Keta Crall ("Keta").  Keta had two sons, Conrad Crall and Auston Soucey.   The romance with Keta ended in late 2009.   See Declaration Tom Claeys attached hereto.

In March of 2010, the house in which Keta, Conrad and Auston lived was foreclosed upon and they had to move.  Keta moved an old mobile home trailer on Claeys' property.  Tom Claeys was not aware of this action until the mobile home had already been moved onto the property.  To say the least, he was not happy with this unilateral action by Keta.  However, Keta, Conrad, and Auston lived in the trailer on Claey's property for several months.  *Id.*

The relationship among Tom Claeys, Keta, Conrad and Auston continued to deteriorate until finally Tom Claeys took legal action to remove them from his property and his life.  He sought and obtained protection orders against Keta and Conrad.  See See Exhibit 1. In addition, Tom Claeys filed a forcible entry and detainer action against them to have them evicted from his property and so he could remove the trailer.   Conrad moved from Tom Claeys property in early August 2010 and Claeys did not see nor have any contact Conrad after that time.  See Declaration of Tom Claeys, ¶5.

On or about September 20, 2010, Conrad Crall was murdered by Shawn Sheeley. According to Eric Garcia, a friend of Sheeley.  Conrad had stolen the purse of

Sheeley's sister.  Sheeley murdered Conrad in retaliation for his stealing the purse.  See Exhibit 3, p. 5.

Sheeley found an acquaintance, Jesus Reyna, to assist him in the murder.  Reyna's street name is "Sleepy".  Sheeley contacted Conrad and invited him to go to the mountains to shoot guns that Sheeley had.  Conrad agreed, and they met at Colorado Boulevard and 40th Ave. Reyes drove them to the mountains on I-70.  They found an isolated location outside of Georgetown, CO, stopped, got out, and walked up the mountain.  At this point, Sheeley turned a gun on Conrad and shot him.  Conrad began to run, and Reyes shot Conrad several times.  Conrad fell.  While Conrad was down, Sheeley finished the job by shooting Conrad in the head with a sawed off shotgun at point blank range.  See Exhibit 4, pp. 34-36.

Sheeley subsequently admitted to Garcia that he had murdered somebody in the mountains.  However, Sheeley did not disclose who the person was.  Garcia thought Sheeley was lying but began to believe him when Garcia heard the news reports about Conrad being found murdered.  See Exhibit 3, p. 5.

A couple weeks later, Conrad's body was found and a murder investigation ensued.  Detective Jim Woolf of the Clear Creek County Sheriff's Office led the investigation.  In the early part of the investigation, Detective Woolf interviewed Keta and Auston.  He asked who they thought may have murdered Conrad.  They both speculated that Tom Claeys had murdered Conrad.  They had nothing linking Claeys to the murder.  Rather, it was the deteriorated relationship they had which caused this speculation. See Exhibit 5, p.4. As a result of this interview, the entire ensuing investigation focused on Tom Claeys as the prime suspect.

3

The investigation continued for over a year and Detective Woolf could not find anything to bring charges against Claeys. See Deposition of Christian Mohr, Exhibit 6, pp. 17. The case went cold. In February of 2012, Detective Woolf sought the help of the Colorado Bureau of Investigation. Christian Mohr was assigned to the case for CBI. Detective Mohr was inexperienced in homicide investigations only previously investigating one true homicide in his career. See Exhibit 6, pp. 39-41.

The investigation with Detective Mohr uncovered that the telephone pinging of Sheeley's phone followed Conrad's phone up to the site of the murder and then back down to Denver. As a result Mohr and Woolf suspected that Sheeley was involved in the murder and decided to interview him. The interview happened on April 24, 2012. See Exhibit 11.

Detective Mohr began the interview with Sheeley. Detective Woolf was present for the interview and listened to Mohr's questioning from an adjoining room that had a video monitor and speakers. See Exhibit 11, pp. 78-79.

Detective Mohr understood how the criminal mind worked. He understood that Sheeley was involved in the murder given Sheeley's proximity to Conrad's phone at the time of the murder. He also understood that as the questioning became more intense that Sheeley would find ways to minimize his involvement in Conrad's murder. Specifically Mohr stated:

> "So as -- as you look at what [Sheeley] had discussed with me, he provided many different explanations and as you watch these guys, it's really interesting, watching anybody that you're interviewing that you're very sure has done something because they're -- the wheels are racing; right? The wheels are racing. Okay. How do I get out of this? How do I get out of this? How do I get out of this? And I feed him something that kind of puts him back into a corner with this interview in the sense, Well, I

know your phone has gone up there and I know you had possession of that phone. So okay, how do I get out of it?"

Exhibit 6, p. 68, ll. 4-16.

Thus, Mohr knew and understood that Sheeley would be looking for an out to minimize his liability as the questioning got more intense.   As demonstrated in the interview with Sheely, below, Mohr decided to give Sheeley the out.   Mohr set up the stage in Sheeley's mind that Mohr believed that Tom Claeys was the mastermind of the murder of Conrad.  Mohr convinced Sheeley that if someone else, namely Claeys, could be implicated as the mastermind of the murder, Sheeley would receive a lighter sentence.

As the interview progressed, rather than focusing on Sheeley's actions and getting him to confess to the murder, Detective Mohr began to set the stage that they knew Tom Claeys was the mastermind of the murder and that Sheeley an unwitting accomplice to Claeys.   Mohr began by stating to Sheeley:

> Now, because I don't think that--before I--before I start explaining this, I don't think you're-- you're any sort of bad dude. . . . But I think you got caught up in some bad sh**, some really bad sh** because you were out of a job, because you didn't have any sort of way to live or anything else like that. . . And you got caught up in some bad sh** with Tom Claeys.

Exhibit 11 p. 130, ll. 8-20.

Mohr continued to create the impression that they believed Claeys was the mastermind and committed the murder.  Mohr stated:

> --what do you think Tom Claeys is covering for his ass right now and for Veronica Valentine are saying to us?

Exhibit 11, p. 132, ll. 4-6.

Okay. So I'm going to be--I'm going to be straight with you, okay, what if I was--what if I was (inaudible) very clearly that I have enough to pursue you in a murder conspiracy?

Exhibit 11, p. 133-34, ll. 24-25, 1-2.

And what if I was to tell you to that it's not just that you're being (inaudible) on, you're being labeled as the dude. . . Not just--not just--not just a guy that was helping out but the dude.

Exhibit 11, p. 134, ll. 7-12.

Okay. Well, I'm telling you this is-- this is--this is me giving you my word-- my word that I don't think you were the one orchestrated-- orchestrated this thing. I don't think that you were the one that--that said this is what we need to do. I don't think you even necessarily knew the guy that's what I think. But I don't think that I can go any forward with this[1] or anything else like that if you just tell me no when I have the phone records documenting that you talked to your mom after this. And I--just-- just listen--just listen to me before I--documented and I have people telling me--not only--not only but--do I have people telling me that you were involved but the description of the weapon that you had. Not only do I have that, I have your phone pinging as it goes up --it meets up with this person. . .

The phones meet around right around I-70, your phone up in the mountains. Exactly when this person [Conrad Crall] disappears it goes back down.

Tom he didn't remember--he didn't remember his phone so he's going to try to skate; he's going to try to skate on this completely. I'm not talking about because of maybe, because of possibly, because he wants to pin it on you 100 percent.

Exhibit 11, p. 136, l. 1-7.

[Claeys] says--he says Shawn is the mastermind of this thing. And then we talked to Veronica and we talked to other people that said yeah, he talked about this thing. But you know what they tell me, they tell me, Shawn is somebody that was involved but they're not sure--they can't see that he'd be the mastermind of this thing; that he'd be the one that's cold blooded like that; he's not the mastermind of this thing. . . But [Claeys] he says-- he's the only witness. . .

---

[1] The undersigned interprets this statement as Mohr suggesting that he can reduce Sheeley's charges or sentence.

So what I'm saying-- is you can play it--complete dumb on me or you can actually tell me what the hell went on because I don't believe that sh** for a second that you were the mastermind of this thing, but I do know you were there. I do know you were there.

Thus, Mohr set the stage for Sheeley that Mohr believed that Claeys was at the scene of the crime and was the mastermind.  However, Mohr went a step further.  If Sheeley did not implicate Claeys as the mastermind, Sheeley would be tried as the mastermind.  Mohr impressed upon Sheeley that the "mastermind" meaning the one "who thinks the thing up" and plans the murder is the one who "get hammered" meaning that the mastermind gets the longest prison sentence.  See Exhibit 11, p. 142..   Mohr made it very clear to Sheeley:

[B]ut you've got to believe me man, it was him [Claeys] --because that's-- that's the guy that really gets the hammer to the thing, right, is the guy that-- is the guy that thinks this thing up and says hey we've got to go do this to this guy; that's the guy that really gets hammered for this thing.

Exhibit 11, p. 142, ll. 10-15.

After all this setup, Mohr asked Sheeley:

So when I--that's all I'm saying. What--what can you give me, Shawn, what can you give me, what can you throw a bone to me that you weren't the mastermind of this, buddy, that this was not something that Shawn Sheeley thought up.

Exhibit 11, p. 142, ll. 15-18

 At that point seeing that Sheeley had a chance to get a lesser sentence, Sheeley took the "out" provided by Mohr began to implicate Claeys in the murder of Conrad. Detective Mohr had already set the table for Sheeley to implicate Claeys as the mastermind.  Mohr was quite explicit to Sheeley that Mohr believed Claeys was the

mastermind.  Mohr gave Sheeley every out to implicate Claeys in the murder.  Of course, Sheeley knew the details of the crime because Sheeley was the mastermind of the murder.  It was really easy for Sheeley to include details of the crime to make a believable story – Sheeley was the murderer.  However, setting details of how Claeys was involved proved more problematic for Sheeley.

Sheeley began by stating that Claeys wanted Conrad dead.  He added that there were two other men involved in the murder brought by Claeys.  Sheeley claimed that he and Claeys waited in the car while the other two men murdered Conrad.  See Generally Exhibit 11, pp. 184 - 205.

However, a story which did not have Claeys actually committing the murder was not sufficient for Mohr.  He needed to have a story where Claeys pulled the trigger.  After Mohr failing to get a story which suited his purposes, he promised Sheeley:

> [I]t's time to come clean and I think it's going to help you. But I don't know, it depends on what you tell me.  I can't--you know, I can't guarantee anything**. Except for I do know one thing.  Is if you come clean with this story, I can approach the DA's office, okay**. (Emphasis added)

Exhibit 11, p. 163, ll. 8-13.

After a long set up, and placing in Sheeley's head that he can get more lenient treatment if he can implicate Claeys as the mastermind, Mohr promised to go to the DA and get lenient treatment if Sheeley "would come clean with this story".

Mohr wanted a story that more directly implicated Claeys as the murderer.  Sheeley complied.  Sheeley took the details of what Sheeley did to Conrad and stated that it was Claeys who took those actions.  After several variations of the story of how Claeys

murdered Conrad, Mohr and Woolf were satisfied with story as currently being told by

Sheeley.

Later in the interview, Detective Woolf took over the questioning.  Since Sheeley

made the satisfactory statements to Mohr, Woolf told Sheeley:

> "Because what Christian was telling you, is I'm going to go to boot for
> you with the DA's office as long as you're willing to be my friend-- and
> testify— [against Claeys]."

Exhibit 11, p. 201, ll. 19-23.

In return for this promise, Sheeley wrote a statement implicating Claeys and

signed it.  See Exhibit 14.

Mohr was aware of the problems with Sheeley's veracity.  In his CBI report he

expressed concerns about the multiple conflicting stories Sheeley gave, but claimed he

was satisfied with the final story. See Exhibit 7, Mohr Notes on Sheeley Interview.

These concerns were never presented to the magistrates in the arrest and search affidavits.

Mohr and Woolf had no evidence corroborating Sheeley's statements about

Claeys involvement in the murder.   They had questions about Sheeley's veracity.

Importantly, "facts" as stated by Sheeley did not line up with in the information given to

them by the only third party eye witness Tommy Hines.

Mr. Hines was working on his RV at Shiloh Temple the afternoon of September

20, 2010.  Mr. Hines saw a Maroon Ford Pickup truck (Conrad's Vehicle) and a white

four door sedan pull into the Shiloh Temple parking lot between 2:00 and 3:00 p.m.

According to detective Woolf's notes, Mr. Hines was "adamant" about the time in which

the transaction occurred.   He saw Conrad get out of the truck and voluntarily walk and

get into the white car – which did not match the description of Claeys car.   Mr. Hines

said nothing about Conrad being held at gunpoint.   Also Hines description of the people there did not match the description of Mr. Claeys.  See Exhibit 18.

DNA evidence was obtained from the crime scene.  However, Mohr and Woolf did not take any actions to obtain Claeys' DNA and see whether his DNA matched that at the crime scene pre-arrest.  After arrest, Claeys' DNA was taken and there was no match found.   See Exhibit 6, pp. 101-102.

However, despite conflicting facts, and a very shakey witness confession, Mohr and Woolf were not going to waste any time getting charges filed against Claeys.   They were always convinced that Claeys was the primary suspect even after it was found that he had nothing to do with the murder.  See email for Mohr to Woolf, Exhibit 13.

Mohr and Woolf agreed that Mohr would write the affidavits for arrest and search.  Mohr wrote the affidavits on the evening of April 24, 2012 and had them reviewed by Woolf.  See Affidavits Exhibit 9 and 10.  See also, Exhibit 6, p. 98.  By the morning of April 25, the affidavits were submitted to the Court and arrest and search warrants were issued.  Claeys was arrested and spent 90 days in jail for a crime he did not commit.

Mohr and Woolf subsequently filed an affidavit for arrest of Shawn Sheeley for the murder of Conrad.  See Exhibit 9, Affidavit for arrest.  The affidavit was substantially similar to the affidavit for arrest and search of Claeys.  However, the final page of the affidavit adds additional information to show the criminal culpability of Sheeley which was missing from the Claeys affidavit.

Despite the arrest, other detectives continued investigating the information provided by Eric Garcia, especially about the identity of "Sleepy".  Ultimately, "Sleepy"

was found to be Jesus Reyna. See Exhibit 4, pp. 1. Reyna was interviewed and consistent with the statements made to Eric Garcia, Reyna stated that it was he and Sheeley who committed the murder.  See Exhibit 4, pp.   Claeys had no involvement in the murder. Ultimately, Sheeley acknowledged that he lied to Mohr and Woolf about Claeys involvement in the murder.  See Exhibit 12, Sheeley's Written Statement to the District Attorney.   Claeys was released and cleared of all wrongdoing.  See Exhibit 8. Sheeley and Reyna were charged and they pleaded guilty to 2nd degree murder.  See Exhibits 15 and 16, Shawn Sheeley Guilty Plea and Waiver of Rights, and Jesus Reyna Guilty Plea and Waiver of Rights.

### III.  STANDARD OF REVIEW

With respect to Defendants' qualified immunity argument: "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in order to defeat the defendant's motion.  The plaintiff must demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity." *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). However, in determining whether the plaintiff has met its burden of establishing a constitutional violation that was clearly established, the Court must construe the facts in the light most favorable to the plaintiff as the nonmoving party.  *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009).

Regarding all other arguments by the Defendants:  Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The party moving for

summary judgment has the burden of showing beyond a reasonable doubt that it is entitled to summary judgment. *Trainor* v. *Apollo Metal Specialities, Inc.,* 318 F.3d 976,979 (10th Cir. 2002).

Only after the moving party makes this showing is the nonmoving party obligated to bring forward specific facts to rebut the movant's case. *Id.* Accordingly, a moving party who bears the burden of proof at trial "cannot force the nonmoving party to come forward with 'specific facts showing there [is] a genuine issue for trial' merely by pointing to parts of the record that it believes illustrate the absence of a genuine issue of material fact." *Id. (quoting Mudrick* v. *Cross Services, Inc.,* 200 Fed. Appx. 338, 340 (5th Cir. 2006).

## IV.  ARGUMENT

### 1.   Defendants' Creation, Review and Approval for Submission the Arrest and Search Warrants Violated the Plaintiff's Constitutional Rights.

It is a "clearly established" violation of a plaintiff's Fourth and Fourteenth Amendment rights to knowingly or recklessly make misstatements, or omit from a search or arrest affidavit information which, if included, would have vitiated probable cause. *Stewart v. Donges,* 915 F.2d 572, 582-83 (10th Cir. 1990).   When applied to an affirmative misstatement, this is known as a *Franks* claim; and when applied to a material omission, it is referred to as a *Reverse-Franks* claim.  See *Smith v. Matos,* 506 Fed. Appx. 894, n. 3 (11th Cir. 2013).

*Franks* and *Reverse-Franks* have been applied in Section 1983 claims sounding in malicious prosecution, false arrest/imprisonment and unlawful searches, see *Stonecipher v. Valles,* 759 F.3d 1134 (10th Cir. 2014)("Officers must have probable cause to initiate a

search, arrest, and prosecution under the *Fourth Amendment."); Sherwood v. Mulvihill*, 113 F.3d 396 (10th Cir. 1997)(applying *Franks* to a search warrant); see also, *Grubbs v. Bailes,* 445 F.3d 1275, 1278 (10th Cir. 2006)(false arrest, malicious prosecution); (*Sherwood v. Mulvihill,* 113 F.3d 396, 400 (3rd. Cir. 1997)(unlawful search); *Lennon v. Sharon Hill Borough*, 2014 U.S. dist. Lexis 49578 (E.D. PA 2014)(false imprisonment/arrest); *Carley v. Tkach,* 2008 U.S. Dist. Lexis 6691 (D. NJ 2008)(false arrest).

A law enforcement officer has a duty to refrain from obtaining an arrest or search warrant without probable cause.  A Section 1983 claim is established when it is shown a law enforcement officer obtained a warrant without probable cause.   *Malley v. Briggs*, 475 U.S. 335, 343 (1986).

> "[A]n officer who knows that objectively unreasonable decisions will be actionable may be motivated to reflect, before submitting a request for a warrant, upon whether he has a reasonable basis for believing that his affidavit establishes probable cause. But such reflection is desirable, because it reduces the likelihood that the officer's request for a warrant will be premature. Premature requests for warrants are at best a waste of judicial resources; at worst, they lead to premature arrests, which may injure the innocent or, by giving the basis for a suppression motion, benefit the guilty."

*Malley,* 475 U.S. at 343.

### a.   The Statements Made by Sheeley and Included in the Affidavit were False.

There is no question at this point that the statements made by Sheeley in the interview and included in the Affidavits by Mohr and Woolf were false.  Sheeley even acknowledges that he lied to Mohr because he was "scared" that Mohr would think Sheeley was a "bad person".  See Exhibit 12.   These statements by Sheeley were necessary to establish probable cause in the Affidavits.  Mohr acknowledges that without

Sheeley's statements the Affidavits do not provide probable cause to arrest Claeys or search his home.  See Exhibit 6, p. 89, ll. 8-18.  Thus, the false statements by Sheeley were the necessary and critical components to create probable cause in the Affidavits.

### b.  Defendants Omitted from the Affidavit that Promises of Leniency were Used in Obtaining Sheeley's Confession.

It has been clearly established since no later than 1997 that confessions by a witness implicating the defendant, brought about through promises of leniency, violate the defendant's constitutional rights.  *Clanton v. Cooper,* 129 F.3d 1147, 1159 (10th Cir. 1997).  Such a coerced confession when used in an arrest affidavit can the basis for a Section 1983 claim.  *Id.* [2]

It is improper for the investigating officer to infer in any way that the interviewee "would get off lightly" if he was to confess to a pattern of events suggested by the investigator.  *Id.* at 1158.  The *Clanton* Court acknowledged that officers lying about facts to the interviewee can be tolerated.  However, "courts are much less likely to tolerate misrepresentations of law."  *Id.* at 1158, quoting 1 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 6.2, at 446-47 (1984).

Mohr's statements that Sheeley would get "really hammered" if he was the "mastermind" were clearly designed to convey to Sheeley that the "mastermind" would receive a more severe prison sentence than the one who was not the mastermind.   Thus,

---

[2] Defendants asserted that Claeys does not have standing to assert Sheeley's coerced confession as the basis for the constitutional violation.  However, the Tenth Circuit has rejected this argument.  *Clanton v. Cooper,* 129 F.3d at 1157 (Before discussing the coercion issue, however, we must determine whether Clanton may contest the voluntariness of Eaves's confession. We conclude that she may. . . Clanton may contest the voluntariness of Eaves's confession not based on any violation of his constitutional rights, but rather as a violation of her own Fourteenth Amendment right to due process).

Mohr's misrepresentations were misrepresentations of law.  Mohr was clear why he used this relative guilt message on Sheeley:

> THORBURN:  What do you mean a person is more guilty?
>
> MOHR:  That's what I was trying to – I guess -- if you want to use the word lie or trick -- trick Sheeley into believing that there was one person that would have been more guilty, i.e. allowing him to have an out for his particular behaviors.

Exhibit 6, p. 62, ll. 9-15.

Thus, Mohr was trying to convey to Sheeley that not being the mastermind would give Sheeley an "out for his particular behaviors".  Mohr understood that he was conveying to Sheeley that he would receive a lighter prison sentence if he would implicate Claeys as the mastermind.  These actions are improper coercion and an improper promise of leniency.  *Clanton, supra.*

> **c.   Mohr and Woolf's Promises to go to the DA in Return for Sheeley's Testimony Were Improper Promises of Leniency.**

As discussed more thoroughly in the Facts section, Mohr promised Sheeley that he would go to the DA in return for "clean" testimony.   Exhibit 6, p. 163, ll. 8-13.  The clear import of Mohr's statement was that in return for the preferred statement of events, Mohr could get preferential treatment.

Woolf provided a similar promise when he said that he would "go to boot" for Sheeley with the DA since Sheeley provided the testimony for which Mohr was looking.

Plaintiff's expert Timothy T. Williams, Jr., discusses in detail how police officers are trained not to give promises in return for confessions.  Both Mohr and Woolf violated this basic rule.  See Exhibit 17, Expert Report of Timothy T. Williams, Jr., p. 5.

Given the above, the Plaintiff has made a *prima facia* case that improper promises of leniency were used to obtain Sheeley's false statements.  These false statements were used in the Affidavits and were instrumental in creating the impression of probable cause.

> **d.   The Affidavits Failed to Include the Eye Witness Testimony of Tommy Hines.**

Tommie Hines was the only third party eye witness to the events where Conrad and Sheeley met at Shiloh Temple and Conrad drove off with Sheeley.  Hines was adamant that the transaction occurred between 2:00 and 3:00.  See Exhibit 5, pp. 6-7. Also, Mr. Hines made no mention that Conrad was being held at gunpoint when he went to Sheeley's car.  Also, Hines stated that Conrad got into a white car which did not meet the description of Claeys vehicle.  *Id.*  As expert Timothy T. Williams observed, the omission of Hines' statements was a "critical omission".  First, Hines' statements were contrary to Sheeley's statement.  Second, Hines' statement of the time of the transaction made it impossible for Claeys to have been at the scene of the crime.  The telephone transaction between Claeys and Sheeley ended at 1:58 p.m. September 20, 2010.  Claeys asserts that in normal weekday traffic, it takes approximately 1 hour 45 minutes to get from his house to I-70 and Colorado Blvd., which would make it impossible for Claeys to be at the location at the time Hines stated the transaction occurred.

Even Defendants' expert does not place Claeys within the eyewitness Hines' timeframe.  Defendants' expert Dan Montgomery stated that it took 1 hour and 7 minutes to travel.  However, he acknowledged that he made the trip on September 20, 2015 – which is a Sunday.  September 20, 2010 (the date of the murder) was a Monday.  It does not take much to realize that traffic in the city is considerably different on Sunday afternoon than Monday afternoon.  Furthermore, Mr. Montgomery did not take into

consideration that Mr. Claeys property is large acreage and another 5 – 10 minutes needs to be added to the trip time.  See Declaration of Tom Claeys.

Thus, at the earliest, using Mr. Montgomery's times, Mr. Claeys could not have arrived at Shiloh Temple earlier than 3:05 – which is outside of the time frame of the eye witness Mr. Hines.  Adding the additional travel time from Mr. Claeys home to the street, would place his earliest arrival at 3:15 which is clearly outside of Mr. Hines' timeframe. Further, taking Defendant Woolf's "Google" time estimates [Doc. 106-12] of taking between one hour and 19-24 minutes, Mr. Claeys's earliest arrival time is 3:30 or after, completely outside of Mr. Hines' eye witness observations.

Given the above, the failure to include the statements of the only third party eye witness to the transaction at Shiloh Temple (Tommie Hines) was material, and fell below any standard of care of a police officer.

> **e.  The Purported Review of the Affidavits by Deputy DA's Does not Help the Defendants' Cause.**

The purported review of the Affidavits by Deputy DA's does not help the Defendants' cause.  First, there is no documentation that in the less than 24 hour period from the time of the Sheeley interview to the time of the submission of the Affidavits, that any DA reviewed the Affidavits for accuracy.  See Exhibit 6, p. 95-96.  Second, there is nothing in any of the affidavits submitted by the Defendants, that the DA's reviewed the interview itself or any of the source documents.  Any review by a DA without the source documents could not determine whether the statements stated by Mohr and Woolf were accurate.

**f.   Woolf Personally Participated in the Unconstitutional Activity.**

The fact that Woolf did not sign the affidavit does not insulate him from liability. Jim Woolf was the lead investigator.   Exhibit 6, p. 15, ll. 17-19.  He, as lead investigator, should have been aware of all the information gathered during the investigation.  *Ott v. City of Milwaukee,*  2014 U.S. Dist. Lexis 132649, p. 24 (E.D. WI 2014).   He certainly was aware of the promises of leniency discussed above.  Woolf also personally participated in the promises of leniency to Sheeley.   Exhibit 11, p. 201, ll. 19-23.  Woolf personally reviewed and approved the Affidavits before submission and had final say as to all of the investigatory process.  Exhibit 6, p. 98, ll. 10-21.  Thus, Woolf was fully aware of the coerced confession and as lead investigator allowed these false affidavits to be submitted.

As the Tenth Circuit has stated:

> "Concerning a defendant acting in a non-supervisory capacity, there must be cause in fact between the conduct complained of and the constitutional deprivation. See *Wulf v. City of Wichita*, 883 F.2d 842, 864 (10th Cir. 1989); *Reimer v. Smith*, 663 F.2d 1316, 1322 n.4 (5th Cir. 1982); *Bennett  v. Passic,* 545 F.2d 1260, 1262-63 (10th Cir. 1976). But, as stated by the Seventh Circuit:
>
> "'For liability under section 1983, direct participation is not necessary. Any official who "causes" a citizen to be deprived of her constitutional rights can also be held liable. The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'"

*Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990).

As stated above, Woolf, as lead investigator, reviewed and approved the affidavits for submission with complete knowledge of the unconstitutionally coerced witness confession.   He was also aware of the fact that Claeys was two hours away from the

scene of the crime when it was committed.  Woolf certainly, by his approval for

submission as lead investigator, set in motion a series of events that Woolf knew or

reasonably should have known would cause others to deprive the plaintiff his

constitutional rights.  *Id.*  Thus, the Plaintiff states a claim against Defendant Woolf.

> **g.   Mohr and Woolf Should have Provided the Court the Fact that Sheeley was Considered a co-conspirator and Was Also Being Charged with the Murder.**

Mohr and Woolf left out the fact that Sheeley was being charged as a co-

conspirator in the murder of Conrad.   This is an important element for the Court to

consider when determining whether the Affidavit has probable cause.  It is well known:

> "Criminals are likely to say and do almost anything to get what they want, especially when what they want is to get out of trouble with the law. This willingness to do anything includes not only truthfully spilling the beans on friends and relatives, but also lying, committing perjury, manufacturing evidence, soliciting others to corroborate their lies with more lies, and double-crossing anyone with whom they come into contact, including the prosecutor. A drug addict can sell out his mother to get a deal, and burglars, robbers, murders, and thieves are not far behind. Criminals are remarkably manipulative and skillfully devious. Many are outright conscienceless sociopaths to whom "truth" is a wholly meaningless concept. To some, "conning" people is a way of life. Others are just basically unstable people. A "reliable informant" one day may turn into a consummate prevaricator the next."

*The Use of a Criminal as a Witness, a Special Problem, Lecture Materials October 2007,*
Stephen S. Trott, Senior Circuit Judge United States Court of Appeals for the Ninth
Circuit, attached hereto.

> **2.   It is Clearly Established that the Confession Brought about by Promises of Leniency Violated Claeys' Constitutional Rights.**

As stated above, the confession by Sheeley implicating Claeys was brought about

by promises of leniency by Mohr and Woolf.  Both were fully aware of the events of the

interrogation and confession as they were both present for the entire interrogation.  Thus

they both had knowledge of the event.  It has been clearly established since no later than 1997 that confessions by a witness implicating the defendant, brought about through promises of leniency, violate the defendant's constitutional rights.  *Clanton v. Cooper,* 129 F.3d 1147, 1159 (10th Cir. 1997).  Such a coerced confession when used in an arrest affidavit can the basis for a Section 1983 claim.  *Id.*

### 3.  The Affidavits without the Coerced Confession and Material Omissions Lack Probable Cause.

In reviewing a *Franks* claim, the Court should review the affidavits, excise the material misstatements, and supply the material omissions to determine whether the affidavits stated probable cause.   See, *United States v. Gentry*, 406 Fed. Appx. 274 (10th Cir. 2010).

As acknowledged by Defendant Mohr, when Sheeley's confession is excised from the Affidavits, there is no probable cause to either arrest Claeys or search his home.  When the other material omissions stated above are added, it becomes even more clear that there is no probable cause in the Defendants' Affidavits.

### 4.  Probable Cause for Arrest is no Different than Probable Cause for Search.

The analysis of probable cause for arrest is no different than probable cause for a search.  *Poolaw v. Marcantel,* 565 F.3d 721, 730 (10th Cir. 2009).  Thus, the analysis regarding the unlawful search will be the same.  *Id.*

For the reasons stated above, the vitiated probable cause in the search warrant allows the Plaintiff to state a *Franks* claim for the search.

It also should be noted, that all Plaintiff has to show was that the search was performed.  The plaintiff may recover all damages proximately caused by the unlawful

search.  While Defendant Woolf generally discussed that other officers may have caused the damage, this goes to the foreseeability issue and whether the other officers actions were an intervening event.   Intervening events are affirmative defenses.  It also should be noted, that all Plaintiff has to show was that the search was performed.  The plaintiff may recover all damages proximately caused by the unlawful search.  While Defendant Woolf generally discussed that other officers may have cause the damage, this goes to the foreseeability issue and whether the other officers actions were an intervening event.   An intervening event is an affirmative defense.  *CitiMortgage, Inc. v. Am. Title Servs. Co.,* 2012 U.S. Dist. LEXIS 100865  (D. Colo. 2012).  Thus, the burden would be on the Defendant to show the intervening event which has not been done.

Nevertheless, if the Plaintiff does not recover any actual damages, he will be awarded nominal damages for the unlawful search.  See *Denver Justice and Peace Comm. v. City of Golden,* 405 F.3d 923 (10th Cir. 2005).  Thus, it does not matter for purposes of summary judgment whether or not there were damages associated with the unlawful search.

## V.      CONCLUSION.

Given the above, summary judgment should be denied.

DATED THIS 22ND DAY OF JANUARY, 2016.

THE LAW OFFICE OF JAMES D. THORBURN, LLC

By:    */s/ James D. Thorburn*
James D. Thorburn
The Law Office of James D. Thorburn, LLC
5460 South Quebec Street, Suite 330
Greenwood Village, CO 80111
(303) 646-3482
jdt@thorburnlaw.com

<u>**CERTIFICATE OF SERVICE**</u>

       I hereby certify that on this 22ND day of January, 2016 I electronically filed the above and foregoing using the CM/ECF system which will send notification to such filing to the following e-mail addresses:

Kathleen Spalding
Patrick L. Sayas
1300 Broadway, 10th Floor
Denver, Colorado 80203
pat.sayas@state.co.us
Kit.Spalding@state.co.us


Timothy Peter Schimberg
FOWLER, SCHIMBERG & FLANAGAN, P.C.
1640 Grant Street, Suite 150
Denver, Colorado 80203


*s/ James D. Thorburn*
_____